IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| William Messner, <br><br> Plaintiff, <br> v. <br><br> Anthony Calderone; Michael Sturino; Vanessa Moritz; Theresa Steinbach; Sally Cody; Michael Boyle; Laura Falbo; Reich & Becker Agency; Inc.; the Officers and Directors of Reich & Becker Agency, Inc., individually and as officers of Reich & Becker Agency, Inc.; and the Village of Forest Park, a municipal corporation. <br><br> Defendants. | Case No. 07 C 893 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Messner ("Messner") originally brought this action against Defendants the Village of Forest Park (the "Village"), Anthony Calderone ("Mayor Calderone"), the Mayor of Forest Park, Michael Sturino ("Sturino"), the Village Manager, Vanessa Moritz ("Moritz"), the Village Clerk, Theresa Steinbach ("Steinbach"), a Village Commissioner, Sally Cody ("Cody"), a Deputy Village Clerk, Michael Boyle ("Boyle"), a Village Inspector and Head of the Department of Health and Safety, Laura Falbo ("Falbo"), a Village staff member (collectively the "Employees") and Richard Gray ("Gray"), an agent who managed properties on behalf of the Village, pursuant to 42 U.S.C. §1983 alleging that Defendants violated his rights under the Equal Protection Clause of the United States Constitution. This Court dismissed Messner's equal protection claims and his municipal liability claims without prejudice and dismissed his claims against Gray and his claims against the Employees in their official capacity with prejudice in its order of June 25, 2007.

Messner filed his First Amended Complaint against the Village, the Employees and the Reich & Becker Agency, Inc. and its officers and directors ("Reich & Becker"), both individually and in their official capacity pursuant to 42 U.S.C. §1983, alleging that Defendants violated his rights under the Equal Protection Clause as well as state law claims of retaliatory eviction and failure to prosecute building code violations. The Village and the Employees moved to dismiss the First Amended Complaint. This Court granted the motion to dismiss with prejudice as to Messner's claims of retaliatory eviction and failure to prosecute building code violations but denied it as to Messner's equal protection and municipal liability claims under Section 1983.

The Court held that Messner's allegations that he was treated differently than "all other residents, property owners, and business licensees" and that "no other Forest Park Home Business Licensee was required to have an inspection prior to the receipt of their Renewal Notice" nor were they "denied the renewal of their license by failing to submit to an unlawful inspection" were adequate at that stage to allege an equal protection violation under a "class of one" theory and that Messner's allegation that all the actions against him were taken at the behest of Mayor Calderone was sufficient at that stage to state a claim of municipal liability. The Court also reiterated that it had previously dismissed Messner's claims against the employees in their official capacity with prejudice.

Messner and the Defendants now bring cross-motions for summary judgment on the surviving claims under Section 1983. For the reasons stated below, Messner's Motion for Summary Judgment is denied in its entirety and the Defendants' Motion for Summary Judgment is granted in its entirety.

## **STATEMENT OF FACTS**

### **Disputes Related to Messner's Original Leasehold**

The Village purchased property located at 7608 Adams in the Village in 2001 in order to use the property for an expansion of the Village Hall. Def. 56.1 at 4.[1] Messner lived and ran a home business in an apartment building located on the property and the Village was Messner's landlord. Def. 56.1 at 3. The Village did not allow any of the tenants, including Messner, to renew their leases once it purchased the property because it intended to use the property to expand Village Hall. *Id*. at 3, 5. In January of 2005, at Mayor Calderone's suggestion, Messner negotiated a short extension of his lease with Steinbach. Pl. 56.1 at 104. At some point, however, Messner, the only holdover tenant, refused to leave the property and the Village instituted an eviction proceeding against him. Def. 56.1 at 6, 8.[2]

On March 5, 2005, the Village instituted a forcible detainer action against Messner. Pl. 56.1 at 109. The Village alleged that Messner had failed to make rent payments on his leasehold and that he had failed to surrender the premises within thirty days of a thirty-day notice of termination of tenancy. *Id*. The state court entered judgment against Messner. Messner filed a motion to vacate that judgment on April 8, 2005. *Id*. at 120. Messner included several pictures showing the allegedly poor condition of the property in his motion. *Id*. at 121.

---

[1] Throughout this opinion, the Court will refer to Messner's Statement of Undisputed Facts in Support of his Motion for Summary Judgement as "Pl. 56.1," Defendants' Statement of Facts in Support of their Motion for Summary Judgment as "Def. 56.1" and Defendants' Statement of Additional Facts in Opposition to Messner's Motion for Summary Judgment as "Def. Resp. 56.1." Messner did not file a statement of additional facts in opposition to Defendants' Motion for Summary Judgment.

[2] Sturino, Moritz and Boyle were not Village employees when Messner's lease was terminated. Pl. 56.1 at 96.

Messner's lease required that the property be returned "in like condition reasonable wear excepted." *Id*. at 117. When Messner finally moved out, an individual representing the Village inspected his apartment and told him that it was "okay" and that he could turn in the keys. Pl. 56.1 at 119. On April 1, 2005, Cody sent a letter to Messner notifying him of the Village's intent to charge his security deposit for several cited instances of damage to the apartment. *Id*. at 115. Messner responded to the letter in writing on April 11, 2005, offering to fix the multiple holes in the walls of the apartment - one of the instances of damage cited in Cody's letter. *Id*. at 116.

Rather than directing his complaints to Village Hall, on April 14, 2005, Messner personally delivered photos showing the poor condition of the property at 7609 Adams along with a letter to Steinbach's home mailbox. *Id*. at 126. The letter requested the return of his security deposit and alleged that he had claims for damages against the Village for building code violations. *Id*. at 126, 139. The letter also accused Sturino and Gray of lying about the status of his tenancy in a court hearing in the eviction proceeding. *Id*. at 126. Messner wrote a total of three similar letters to Steinbach, each of which he personally delivered to her home mailbox. *Id*. at 127.

Steinbach felt threatened by Messner' visits to her home and complained to Mayor Calderone. *Id*. at 132; Def. 56.1 at 54. Calderone filed a police incident report on Steinbach's behalf so that the police would advise Messner to conduct Village business through the proper channels at Village Hall. Def. 56.1 at 54. Mayor Calderone had often served as a complaining witness on behalf of citizens who wished to remain anonymous. *Id*. at 55.

Forest Park Police Officer Hohl ("Hohl") met with Mayor Calderone at his office to assist with the incident report. Pl. 56.1 at 83. This was the only time Hohl has ever been called into the mayor's office regarding a complaint. *Id*. at 84. In the resultant police report Hohl cited to

4

statements made to him by Steinbach, Cody and Mayor Calderone. *Id*. at 74. Steinbach and Cody, however, did not speak directly with police. *Id*. at 75, 79. When Hohl approached Messner regarding the police report, Messner was surprised and stated that Steinbach had been helpful in dealing with his situation and that he brought the papers to her home in part because she lived close to him. *Id*. at 87.

**Messner Seeks a Home Business License for his New Leasehold**

In January of 2005, while Messner was preparing to move his home and home business from 7609 Adams to a new location, he spoke with Joan White ("White") who was at that time the Village Clerk about obtaining a home business license for the new premisses. *Id*. at 10. Messner filled out an application for the license on or about January 17, 2005, but White lost the application. *Id*.; Pl. 56.1 at 102. Messner submitted a second application in February of 2005. Def. 56.1 at 10. The application, which Messner signed, stated:

ALL VILLAGE INSPECTIONS, IF APPLICABLE, MUST BE COMPLETED BEFORE RESUMING BUSINESS

> I understand the continuation of the license is conditional upon compliance with all Village Ordinances and the result of any inspection of the above premises at this time or any subsequent inspection while this license is in force. A acknowledge that I am signing this information form under the penalty of perjury and that all information is true and correct.

*Id*. at 13.

White granted Messner's home business license for the proposed new location under the condition that he bring a copy of his new lease to Village Hall and with the understanding that an inspection would be performed when he moved into the new property. *Id*. at 12. Sturino disagreed with White's decision to give Messner a conditional license. Pl. 56.1 at 108.

Messner finally moved from 5608 Adams to his new leasehold at 536 Beloit in March of 2005 with the intention of setting up the property as a recording studio where clients would come to record music that Messner would write or produce. Def. 56.1 at 9; Pl. 56.1 at 102. Messner brought a copy of his new lease to Village Hall on March 3, 2005 - White's last day as Village Clerk. Def. 56.1 at 14, 20. White granted Messner's license but the Village did not inspect Messner's property. Def. 56.1 at 20-21, 26; Pl. 56.1 at 46, 48. The license appeared to be signed by building inspector Robert Teets ("Teets") and certified with Mayor Calderone and Cody's signatures. Pl. 56.1 at 4. Home business licenses expire on April 30 of each year. Def. 56.1 at 22. As such, Messner applied for and received a renewal of his license in April of 2005. *Id*. The Village again mistakenly did not inspect his property. *Id*.

**Messner Completes Extensive Construction on the New Leasehold**

When he presented his lease and received his home business license, Messner told White that the basement of the property was raw and that the owners of the property had agreed to allow him to install carpeting and paint the walls. Def. 56.1 at 14. Rather than simply painting and carpeting, however, Messner performed extensive work on the property beginning in the first week of March 2005. *Id*. at 15. In order to complete his intended construction, Messner and his landlord came to the Village Hall to apply for a building permit in April 2005 - approximately one month after Messner actually began work on the property. *Id*. at 17. They met with Teets, an inspector for the Village Building Department, and Messner sketched a floor plan of his proposed work on the house. *Id*. Messner fully anticipated putting a bedroom in the basement but did not tell Teets nor did he advise Teets that he would be doing electrical work in the basement. *Id*. at 18. Messner's landlord thereafter received Forest Park Building Permit No. 050349 on April 11, 2005. Pl. 56.1 at 27. The

6

landlord received the permit rather than Messner himself because building permits are only issued to property owners - not tenants. *Id*.

Messner completely rehabbed the basement of 436 Beloit including electrical work, structural work and the installation of a basement bedroom. Def. 56.1 at 15. He worked on other parts of the home as well, creating a total of $40,000 of additional value. *Id*. Messner also installed over $144,000 of music recording equipment in the home, essentially converting it into a commercial recording studio. *Id*. at 15, 16. Messner completed construction in May of 2005. *Id*. at 19. He knew that the Village had the right to inspect the property once construction was complete but he did not advise the Village when he finished construction. *Id*.

**Complaints from Messner's Neighbor**

Around April 21, 2005, Moritz received a phone call from one of Messner's new neighbors complaining that Messner had clients routinely coming and going from his property. *Id*. at 32. Indeed, Messner had clients coming and going from his property consistently since he moved in - even when he had no home business license. *Id*. at 34. Moritz made a handwritten note stating "Can we reinspect?" and "pull license because clients coming and going." Def. Resp. 56.1 at 30. She proceeded to look at the Village code to determine what she could do. *Id*. Under Section 9-1-5 of the Forest Park Zoning Code, a home occupation is "incidental and secondary to the use of the dwelling unit for residential purposes.....shall be carried on wholly within the principal building" and shall have no "exterior indication of the home occupation or variation from the residential character of the principal building." *Id*. at 35. Moritz also became aware that the Village had not inspected Messner's premises. *Id*. at 36. Mortiz, unlike White, consistently required inspections for home business license applicants. Def. 56.1 at 27.

7

**The Village's Attempts at Inspection**

On August 18, 2005, Messner sent a letter to Moritz advising her that he intended to change the name of his home business. *Id*. Falbo entered the name change and Moritz informed the Building Department that they should perform an inspection on Messner's home business since one had not yet been performed. *Id*. In addition, Moritz spoke to Messner on the telephone and informed him that an inspection was required. *Id*. at 37. Such an inspection was required both because the premises had never been inspected and because the Village had knowledge of changed circumstances of the business, that is, clients coming and going from the premises. *Id*. at 38.

Before or during January 2006, Boyle received a telephone call from Messner's landlord's attorney, Paul Sengpiehl ("Sengpiehl"), complaining that Messner had performed construction on 536 Beloit that was improper and in violation of the Village code. *Id*. at 39. Specifically, for example, Messner installed a bedroom in the basement. *Id*. After Boyle received this complaint, someone in the Village office notified him that the Village had other difficulties with Messner. Pl. 56.1 at 31. Thereafter Boyle and Teets went to Messner's property unannounced on January 24, 2006 to verify the complaint and see if any construction was done without a permit. Def. 56.1 at 40; Pl. 56.1 at 7. Messner did not answer the door at his residence; so Teets left a business card there. Def. 56.1 at 40; Pl. 56.1 at 11. Messner thereafter sent Teets an email asking why he had visited. Def.56.1 at 40. Boyle, rather than Teets, responded with an email stating that he wanted to check out a complaint he received regarding Messner's property. *Id*. Through a series of emails, Messner demanded to know the nature and source of the complaint, which Boyle declined to reveal. Messner did not allow Boyle to inspect his premises and insisted that such an inspection was a violation of his rights. *Id*.; Pl. 56.1 at 12, 15.

Sengpiehl found out that Boyle was attempting to inspect Messner's leasehold and sent a letter to Boyle on February 14, 2006 granting whatever authority he, as the landlord's attorney, could convey to him to inspect the property. Def. 56.1 at 41. Messner still, however, did not allow an inspection. *Id*. On May 3, 2006, Sengpiehl also wrote a letter to Messner asking to see the basement of the leasehold and to bring a contractor to inspect it. Pl. 56.1 at 22. Messner responded that he would let the contractor in only if Sengpiehl identified him by name and company. *Id*. Neither Boyle nor Sengpiehl disclosed to Messner that they had discussed Boyle's desired inspection of Messner's leasehold. *Id*. at 23.

Boyle went to Messner's property to attempt an inspection at least two more times and Messner responded to the visits by sending an email to Boyle. *Id*. at 13-14. Eventually, since Boyle did not think there was an immediate risk of harm, gave up trying to inspect Messner's property. Def. 56.1 at 40. No other resident who was suspected to have done construction on their property in violation of village codes or beyond the scope of a building permit has refused an inspection request. *Id*. at 65-66. Likewise, no other home business licensee has refused an inspection request after having a citizen complaint lodged against him for conducting a business in violation of the Village codes. *Id*. at 67.

The Village Code provides for inspections under certain circumstances. Section 8-5-3 of the Forest Park Housing Code provides: "the owner or occupant of every dwelling, dwelling unit and rooming unit, or the person in charge thereof, shall give the health commissioner, fire chief and/or director of code enforcement free access to such dwelling, dwelling unit, or rooming unit and its premises at reasonable times for the purpose of inspection, examination and survey." *Id*. at 42. In addition, Section 3-1-5 of the Code provides: "Whenever an inspection of the premises used for or

9

in connection with the operation of a licenses business or occupation is provided for, required by ordinance or is reasonably necessary to secure compliance with any ordinance, or to detect violations thereof, it shall be the duty of the licensee or the person in charge of the premises to admit thereto, for the purpose of making an inspection, any authorized officer or employee of the village." *Id*. at 49.

As a last resort, the Village could have attempted to procure an administrative search warrant for an involuntary inspection but it did not do so. Pl. 56.1 at 40.

**The Village Refuses to Renew Messner's Home Business License**

When the time came for the Village to send out home business license renewal notices for the 2006-2007 period, Moritz instructed Falbo not to send one to Messner and not to give him the forms if he came to Village Hall. *Id*. at 55; Def. 56.1 at 44. Moritz issued this instruction because Messner still had not allowed an inspection of his property. Def. 56.1 at 44. An inspection was necessary prior to renewal because no inspection was done before the original issuance of the license and additionally because the Village was aware of significant changes that necessitated such an inspection. *Id*. at 45. This was the only instance in which Mortiz has instructed Falbo not to give a license holder a renewal form. Pl. 56.1 at 59. This was also the only instance in which Teets had been asked to do an inspection for a license renewal. *Id*. at 56.

Messner eventually obtained the renewal forms online and attempted to renew his license. *Id*. at 66. Messner applied to renew his home business license in writing on April 30, 2006 but his application was denied because he still had not allowed in inspection. Def. 56.1 at 47. Moritz refused to renew his license because he refused to allow an inspection of his leasehold. Pl. 56.1 at

66. No ordinance requires an inspection before the issuance or renewal of a home business license. *Id*. at 51-52.

Messner's landlords passed away and the heirs to 536 Beloit filed a forcible detainer suit styled 07 M4 977 against Messner on May 31, 2007. Pl. 56.1 at 25. The Complaint alleged that Messner was required by his lease to comply with all municipal ordinances and that in violation of municipal ordinance, he ran a business on the premises without a license and refused to allow inspection of the property. *Id*.

The Village has still not inspected Messner's leasehold at 536 Beloit. Def. 56.1 at 23. Messner is the only home business licensee who has not allowed the Village to inspect his premises. *Id*. at 24. He is the only home business license applicant who has refused a Village inspection either on request, for the purposes of securing a license or for the purposes of securing a renewal of a license. *Id*. at 60-62. No other renewal applicants during Boyle's tenure who had not had an original inspection has been granted a renewal without inspection. *Id*. at 3. The Village's practice is that if it is aware that an inspection was not conducted when a home business applicant first applied for a license, an inspection is necessary in order to grant a renewal. *Id*. at 68.

**Mayor Calderone's Involvement**

Mayor Calderone did not direct any of the Employees to take any of the actions discussed in their dealings with Messner. Def. 56.1 at 51, 58. Indeed, Calderone's involvement with Messner has been very limited. *Id*. at 52. Aside from dealing with Messner's visits to Steinbach's home mailbox and suggesting that Messner speak to Steinbach about a obtaining a short lease extension from the Village, Mayor Calderone's only contact with Messner was regarding a series of FOIA requests he sent to the Village. Specifically, Messner made a series of FOIA requests addressing

the Village's issuance of home business licenses and inspection requirements to the Village beginning May 1, 2006. Def. 56.1 at 61. Moritz denied some of the requests on May 30, 2006 and Messner appealed the denials to Mayor Calderone. *Id.* Mayor Calderone affirmed all of the original denials with the exception of one. *Id.* Messner, among other things, requested a list of home business license holders. *Id.* On or about August 21, 2006, after consultation with a Village attorney, Calderone produced addition records to Messner with the personal information of the license holders, all of which he found to be exempt from disclosure, redacted. Def. 56.1 at 57; Pl. 56.1 at 61.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998)

12

("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

# **DISCUSSION** [3]

## **Violation of Equal Protection**

Messner alleges that the Defendants are liable under 42 U.S.C. § 1983 because they violated his rights under the Equal Protection Clause of the United States Constitution. Generally, Equal Protection claims involve charges of singling out members of a vulnerable group for unequal treatment or allegations that a law or policy makes irrational distinctions between groups of people. *See Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) *citing Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995). Alternatively, Equal Protection claims may involve a "class of one," even though such claims are very difficult to prove. *See McDonald v. Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). Messner relies on a "class of one" theory. To succeed, Messner must show that: 1) he was intentionally treated differently from other individuals similarly situated; and 2) there was no rational basis for the difference in treatment or the cause of the different treatment was "totally illegitimate animus" of the Defendants. *Id*.

---

[3] Messner also argues that he has sustainable claims for loss of a property right without due process as well as retaliation for exercise of rights under the First Amendment. Messner, however, did not plead these claims in his Complaint or his First Amended Complaint and has not brought them forth until the summary judgment stage. As such, these claims are waived and the Court will not consider them. *See Old Republic Ins. Co. v. Employers Reinsurance Corp.*, 144 F.3d 1077, 1081 (7th Cir. 1998) (district court could not consider claim not stated in complaint); *see also Carver v. Condie*, 169 F.3d 469, 472 (7th Cir. 1999) (when an amended complaint is filed, it becomes the governing document of the case and any claims not raised fall by the wayside).

In order to succeed in claiming a violation of equal protection under a "class of one" theory, the plaintiff must offer evidence of another individual who was similarly situated but treated differently. *See Sellers*, 453 F.3d at 850 (plaintiff must prove the existence of similarly situated individuals); *Maulding v. City of Springfield*, 454 F.3d 967, 970 (7th Cir. 2006) (burden is on the plaintiff to establish existence of similarly situated individuals). In order to truly be considered "similarly situated," an individual must be prima facie identical to the plaintiff in all relevant respects. *See Purze v. City of Winthrop*, 286 F.3d 452, 455 (7th Cir. 2002); *see also Sellars v. Gary*, 453 F.3d 848, 850 (7th Cir. 2006) (plaintiff must prove that "such individuals were identical to him in all relevant respects").[4] Plaintiffs carry a heavy burden in establishing that an individual is "similarly situated" in the context of class of one claims. *See McDonald*, 371 F.3d at 1003; *see also*, *e.g.*, *Sellars*, 453 F.3d at 851 (retired firefighter not similarly situated to other firefighters who retired seven years after him); *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078-79 (7th Cir. 2005) (police officer who retired after disciplinary proceedings related to unearned overtime not similarly situated to other officers who retired with untarnished records); *Bell*, 367 F.3d at 708-709 (plaintiff who requested pier extension not similarly situated to persons who requested different extensions or replacement rather than new structures or requested the same extension at a different

---

[4] Messner argues that he is not required to submit evidence of a similarly situated individual who was treated differently but rather he need only show that he was the subject of vindictive action by the Village. Messner's representation of the law, however, is wholly inaccurate. In order to support a claim for violation of equal protection based on a "class of one" theory, a plaintiff must show *both* that the government treated prima facie identical individuals differently and that the differential treatment was motivated by "totally illegitimate animus." *See Albiero*, 246 F.3d at 932; *see also Nevel v. Village of Schaumburg*, 297 F.3d at 682 (plaintiffs attempting to show "totally illegitimate animus" required to point to similarly situated individuals). The similarly situated requirement exists because "class of one" claims are at their heart claims of discrimination. *See McDonald*, 371 F.3d at 1009.

time); *Purze*, 286 F.3d at 455 (plaintiff who requested variances from subdivision zoning not similarly situated to others who requested different variances or submitted their requests at different times or to different or previous subdivision boards); *Lerch v. City of Green Bay*, 218 Fed.Appx. 502, 504 (7th Cir. 2007) (landlord subject to multiple complaints from tenants and code violations who received a citation for an unpaved driveway apron not similarly situated to others who simply had unpaved driveway aprons).

There is no precise formula for what constitutes a "similarly situated" individual. *McDonald*, 371 F.3d at 1002. Nonetheless here Messner would be required, at the very least, to point to a second individual who ran a home business that had not only never been inspected by the Village and about which the Village had received complaints. No such individual existed. Here, the Village had received complaints that Messner both ran a business that exceeded the limitations on a home business set by Village Code and completed construction without a permit. Therefore, Messner is differently situated than all other residents, property owners and business licensees because he was violating valid ordinances. *See Schor v. City of Chicago*, - - - F.3d - - -, 2009 WL 2461392, at *2-3 (7th Cir. 2009) (plaintiffs who used cell phones without hands-free devices not similarly situated to other motorists because they were acting in violation of municipal ordinance). In addition, Messner was the only home business license applicant who refused inspection upon the Village's request as well as the only home business licensee who refused an inspection after a citizen or landlord complaint was lodged.

Messner argues that some of the Village employees thought that Messner's situation was "unusual" or that they agreed that they had taken actions that they had not in the past. This, however, does not satisfy the similarly situated requirement because it does not establish that the

15

Village treated Messner differently than anyone "similarly situated." *See Maulding*, 453 F.3d at 970 (statement by alderman that action at issue had not been taken before insufficient); *McDonald*, 371 F.3d at 1003 (assertion that city followed the same procedure in investigating every fire except plaintiff's insufficient).[5]

In addition, the Village was within its rights to request an inspection. The original licensing application that Messner signed specifically stated that the license was conditional upon an inspection of his premises "at this time or any subsequent inspection while this license is in force." In addition, Forest Park Village Code Section 3-1-5 required Messner to allow an inspection when such was "reasonably necessary to secure compliance with any ordinance, or to detect violations thereof." Since the Village had received a complaint from Messner's neighbor that he was exceeding the limitations the Village Code placed on home businesses, such an inspection was unnecessary to verify the alleged violation.

---

[5] Messner alleges in his statement of facts generally that information gathered by a private investigator working on his behalf shows that none of the home business owners that the investigator spoke to had been required to submit to an investigation either at the original issuance of their licenses or at renewal. First, the Court declines to consider this statement of fact because it relies exclusively on hearsay. That is, Messner relies on a short report written by the private investigator summarizing what he was told by the home business license-holders he spoke to, and the statements of these alleged home business license holders are submitted for the truth of the matter they assert - that is, that the businesses were not inspected.

Even if this Court were to consider this statement of fact, it is not adequate to establish that Messner was "similarly situated" to any of the listed home business license holders. The statements note only that 1) two of the business owners the investigator spoke to had their businesses inspected at the time of their original application for a home business license but not at renewal and 2) three other businesses were not inspected at original application or renewal during the 2005-2006 time period. This is simply not enough information to establish that any of these businesses were prima facie identical in all relevant respects to Messner. For example, the Court cannot tell what kind of businesses they are and whether the city had received any prior complaints or other difficulties regarding the businesses or whether any of the owners had specifically refused an inspection.

Regardless, even if Messner was somehow wronged by the Village, he has not shown that any such wrong was discriminatory in nature. *See Id*. Indeed, "every time an actor commits a tort, he may be treating the victim differently than he frequently treats others, simply because tortious conduct is by nature a departure from some norm. Nonetheless, the purpose of entertaining a "class of one" equal protection claim is not to constitutionalize all tort law nor to transform every claim for improper provision of municipal services or for improper conduct of an investigation into a federal case." *Id*. As such, Messner's claim fails "because of the total lack of evidence of someone who is similarly situated but intentionally treated differently." *Maulding*, 453 F.3d 970; *see also Nevel*, 297 F.3d at 682 (plaintiffs failed to point to any similarly situated individuals); *Albiero*, 246 F.3d at 932 (same). Defendants' Motion for Summary Judgment is granted as to Messner's equal protection claim.

**Municipal Liability**

Messner seeks to hold the Village liable for the alleged violations of equal protection. As discussed above, this Court finds as a matter of law that Messner cannot adequately support a claim for violation of his equal protection rights. Therefore, because he cannot establish a violation of his constitutional rights, he cannot support a claim for municipal liability for such a violation. *See Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) *citing King v. East St. Louis School Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) ("It is well-established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights"). Nonetheless, the Court will address whether Messner, if his rights were violated, could sustain a claim for municipal liability.

Respondeat superior does not provide a basis for municipal liability under § 1983. *See Gossmeyer v. McDonald*, 128 F.3d at 494. "[M]unicipal liability exists only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) *quoting Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). Municipalities may be liable for violations of constitutional rights under Section 1983 in three ways: 1) through an express policy that, when enforced, causes a constitutional deprivation; 2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or 3) through an allegation that the constitutional injury was caused by a person with "final policymaking authority." *See McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995).

Messner alleges that the Village is liable because the employees who violated his equal protection rights acted under the direction of Mayor Calderone, an individual who he argues holds final policymaking authority. Messner sets forth no evidence that any of the actions of the Village and its employees that he alleges violated his rights were taken at the direction of Mayor Calderone. Messner sets forth facts showing that Calderone was involved in a small number of what can best be described as side issues between Messner and the Village. Specifically, 1) when Messner was living at the 7608 Adams property, Calderone wrote him a letter in which he suggested that Messner speak to Steinbach about extending his lease; 2) he ruled on an appeal of a FOIA request filed by Messner; and 3) he filed a police incident report on Steinbach's behalf after Messner put a series of letters directly into her home mailbox. The crux of the issue here, however, is whether the Village violated Messner's equal protection rights by demanding that he allow an inspection of his premises

before allowing him to renew his home business license. It is undisputed that Calderone had no involvement in these attempted inspections nor did he direct any other Village employees' involvement in the requests for inspection of Messner's premises and denial of his home business license. As such, Defendants' Motion for Summary Judgment on Messner's claim of municipal liability is also granted.

For the reasons stated above, Defendant's Motion for Summary Judgment is granted in its entirety and Messner's Motion for Summary Judgment is denied in its entirety.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   September 23, 2009